UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICIA and DENNIS HAVLIK, w/h, | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 12-4610 |
| v. | : | MEMORANDUM OPINION & ORDER |
| SCHINDLER ELEVATOR CORP. and CAESAR'S ENTERTAINMENT CORP. d/b/a BALLY'S CASINO, | : | |
| Defendants. | : | |

This matter is before the Court on motions of the Defendants to preclude the testimony of Plaintiff's expert and for summary judgment. Oral argument was heard on the motions on September 9, 2014 and the record of that proceeding is incorporated here. For the reasons articulated on the record that day, as well as those set forth here, the motions will be granted.

Background

On November 19, 2010, Plaintiff Patricia Havlik and her husband, Plaintiff Dennis Havlik, were at Bally's Atlantic City Hotel and Casino in Atlantic City, New Jersey, which is owned and operated by Defendant Bally's Park Place, Inc. d/b/a Bally's Atlantic City. Patricia Havlik Dep., 13:1-5; Bally's Answer with Affirmative Defenses and Cross claims, Dkt. Entry 13, ¶ 3. In order to catch the elevator on the sixth floor, Ms. Havlik placed her right hand between the elevator doors as they were closing. Patricia Havlik Dep., 19:24-20:9, 20:16-17, 85:7-17; Dennis Havlik Dep., 9:22-10:2, 12:9-11. The elevator doors closed on Ms. Havlik's hand, causing injury. Patricia Havlik Dep., 20:17-21:5. Plaintiffs did not report the incident to the Casino on the day that it occurred, but returned the next day and filed a guest incident report. Patricia Havlik Dep., 32:9-15.

Plaintiffs have asserted claims of negligent maintenance of the elevator by Schindler (Count One), negligence/premises liability by Bally's (Count Two), and loss of consortium (Count Three). In support of their claims in this case, Plaintiffs have proffered an expert report dated July 29, 2013 authored by James Filippone as well as a supplemental report dated September 20, 2013 that was also authored by Mr. Filippone.

## Procedural Posture

Presently before the Court is a motion by Schindler Elevator to preclude the expert reports and testimony of Plaintiffs' expert, James Filippone, pursuant to Fed. R. Civ. P. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and for summary judgment pursuant to Fed. R. Civ. P. 56 [38]. Schindler has argued that Plaintiffs cannot prove causation because the Filippone reports amount to no more than an untested assumption that the elevator's 3D sensor was not functioning, and as such are unreliable under Daubert. Similarly, Bally's has filed a motion in limine to preclude James Filippone from testifying at trial [37] and a motion for summary judgment [36]. Bally's argues that Filippone's opinion that the 3D sensor for the elevator door was not functioning at the time of the incident because the 3D function was not on during his February 2013 inspection is an unreliable, speculative net opinion. In addition, Bally's argues that there is no evidence in the record that the elevator was operating abnormally or not within industry standard. Rather, Plaintiff testified that she put her hand in front of normally operating elevator door when it was almost entirely closed; the accident was caused by her own negligence. Bally's also seeks summary judgment on the cross-claim for indemnification by Schindler because Bally's, the property owner, contracted with Schindler for maintenance/inspection.

Discussion

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party

3

must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

To prevail on a claim for negligence under New Jersey law, a plaintiff must establish the existence of a duty owed to the plaintiff by the defendant, a breach of that duty, and that the breach was the proximate cause of the plaintiff's injuries. Keith v. Truck Stops Corp. of Am., 909 F.2d 743, 745 (3d Cir. 1990). An owner of a building has a non-delegable duty to exercise reasonable care for the safety of tenants and persons using the premises at his invitation. Mayer v. Fairlawn Jewish Ctr., 186 A.2d 274, 277–78 (N.J. 1962). That the owner contracts for maintenance of an elevator does not relieve

it of that duty, although it may secure indemnification by contract with the maintenance contractor or at common law. Rosenberg v. Otis Elevator, 841 A.2d 99,105 (N.J. Super. Ct. App. Div. 2004).

The parties agree that the basic facts of the case are not in dispute. Ms. Havlik testified that at the time of the accident she believed it was safe to put her hand in the elevator doors to stop them from closing. (Patricia Havlik Dep., 22:5-8.) Ms. Havlik approximated that the doors were open "a little more" than the width of a legal pad. (Patricia Havlik Dep., 85:13-17.) The doors closed on "the center of [her] hand," (id. at 23:9-13), such that "when [she] looked at [her] hand, the only thing [she] saw was a little edge of [her] hand and [her] wrist. The rest of it was in the elevator." (Id. at 23:4-7.) She also testified, "I remember leading with my hand." (Id. at 74:10.) Similarly, Mr. Havlik testified that "from her wrist to her fingers disappeared," and he noted, "[s]he's got a small hand." (Dennis Havlik Dep., 11:14-20.) Plaintiffs were not able to get on the elevator because "[t]he elevator left." (Patricia Havlik Dep., 75:17-20.) Ms. Havlik theorized, "I guess the elevator inside went to another floor, but the doors remained closed on my hand." (Id. at 75:21-23.)

In 2007, Bally's contracted with Otis Elevator Company to modernize the subject elevator, designated as elevator P-3 by Bally's. (Mattia Dep., 41:13-43:5.) At that time, Otis installed, among other things, new doors, controllers, and an Otis electronic door edge called a Lambda. (Mattia Dep., 42:13-19, 49:7-20, 57:6-21.) Schindler did not manufacture, design, or install the door protection device or any other part of the subject elevator and, since the 2007 modernization, the Lambda electronic edge has never been repaired or replaced by Schindler. (Mattia Dep., 43:12-14; 65:12-66:12.)

5

Schindler's service technician Gregory Mattia testified that he rides the subject elevator approximately once a day during the course of his duties at Bally's but has never noticed any problems with the electronic edge on the subject elevator, and is unaware of any patron other than Ms. Havlik claiming to have been injured by the subject elevator's doors. (Mattia Dep., 64:25-65:8, 67:17-20, 68:1-3.) Further, Schindler's Preventive Maintenance Work Reports from 2010, before and after the subject incident, do not evidence any problems with the subject elevator or its door reopening device. (Schindler maintenance tickets and maintenance summary, signed by Mattia.) The inspections performed by an inspector for Atlantic City from January 2010 through July 2012 also evidence no problems with the subject elevator's door reopening devices. (Atlantic City, New Jersey Elevator Inspection Reports signed by Bud Grant.) Finally, Plaintiffs' liability expert, James Filippone, was unaware of any persons other than Ms. Havlik who had claimed that their hands had been caught in the subject elevator's doors. (Filippone Dep., 84:21-24.)

The subject elevator doors consist of two sets of doors: the car doors, which are part of the elevator car and travel with the elevator (the interior elevator doors), and the hoistway or landing doors, which are the exterior doors on each floor. (July 29, 2013 Filippone Report, p. 3.) There are approximately 6 inches (or 5.625 inches) between the elevator car doors and the hoistway doors. (July 29 Filippone Report, p.3.) Both sets of doors open to a maximum width of 48 inches. (July 29 Filippone Report, p. 1.)

The subject elevator is also equipped with an Otis Lambda 3D door protection device, a device that detects objects in the path of the closing doors and re-opens the doors. (July 29 Filippone Report, p. 3.) The Otis Lambda 3D device has two features. The first feature is a "light curtain" series of invisible infrared beams installed on the car

6

doors which only detects objects that enter the 2D plane of the interior car doors, not the hoistway doors. (July 29 Filippone Report, p. 3.) There is no allegation and no opinion that the 2D light curtain beam series was involved in the subject accident.

The second feature is a 3D system, which is designed to detect objects outside the plane of the car doors. (July 29 Filippone Report, p. 3-4.) It is the 3D system that Plaintiffs allege is involved in causing the Plaintiffs' accident. The Otis Technical Information Publication describes the function of the 3D system as follows:

> Beams of infrared light are aimed from the emitter door unit into the entryway at approximately a 30-degree angle from the plane of door travel. If an object is in the mid-portion of the door opening, some of the light will reflect off the object and into the detector door unit array. If the signal is strong enough, a reversal (relay output contacts open) will occur.
>
> The detection area for sensing 3D targets varies with door separation but is always in the present center of the door separation. When the doors are fully open, the detection zone starts at ~30% of the opening size out into the entryway from the car door plane (e.g., detection should start at ~14 in. for a 48-inch opening). As the doors close, the detection zone recedes towards the car doors. At car door separations of 16 in. or less, the target detection zone is inside typical hoistway doors. The vertical coverage of 3D is between ~18 and ~54 in. from the bottom of the door units.
>
> Target detection varies with the amount of door separation. When doors are separated more than ~24 in., the system detects both large and small objects. A large object (in this context) is a human body torso. A small object is an extended arm, for example. The larger the target, the more likely it will be detected.
>
> As the doors close, the detection operation changes. As the door separation narrows from 24 to 18 in., the system will ignore large targets as noise. It will, however, detect small objects such as an extended arm or hand. In the last ~18 in. of door travel, the system will only detect small objects that are rapidly moving into or out of the hoistway door zone (provided this region is enabled via dip switch 7), such as a last-second attempt to extend a hand and stop the doors. If the system falsely senses objects in this region, dip switch 7 can be used to enable or disable 3D operation in this

7

region.

(Otis Technical Information Publication at pp. 2, 5-6.)  Thus, according to Otis, the location and size of the detection area in which the 3D system will work will depend, among other things, on how far apart the elevator doors are at a given moment.

> Plaintiffs' expert, James Filippone, opines in his July 29, 2013 report that:
>
> The cause of the door reopening device not detecting Ms. Havlik's hand/wrist is that the 3D function [i.e. the 3D system] was not turned on. If this 3D protection had been turned on when Ms. Havlik attempted to enter the incident elevator, the doors would not have closed on her hand/wrist and she would not have suffered any injuries.

(July 29 Filippone Report, p. 4.)  In a supplemental report dated September 20, 2013, Filippone stood by this conclusion and further opined that the 3D function was not on during his inspection in February 2013 and must have been off at the time of the subject incident.  (Sept. 20, 2013 Filippone Report, p. 1.)  As such, Plaintiffs assert that Schindler negligently failed to enable the Lambda 3D safety device on the elevator in question.  With regard to Bally's, Plaintiffs argue that the company, by and through Schindler, was required to activate the Lambda 3D via dip switch 6 and 7 and keep it activated at all times; Bally's alleged failure to do so caused Plaintiff's injury.

Defendants seek to preclude Filippone's testimony,[1] arguing that his opinion that the accident was caused because the 3D sensor was off is not based upon any evidence or scientific methodology, but relies solely on speculation and, as such, is unreliable.

---

[1] Whether to hold an *in limine* hearing upon a Daubert objection is an issue that "rests in the sound discretion of the district court."  Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).  See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.").  A hearing may not be required in all

8

Plaintiffs have argued that "expert testimony is not required to prove that the subject elevator malfunctioned, but it is only necessary to 'provide an explanation in lay terms of the possible ways in which the accident could have occurred that would more likely than not point to defendant's negligence as a substantial contributing cause.'" Pl. Opp'n Br. [44, 46], p. 1 (quoting Gore v. Otis Elevator Co., 762 A.2d 292, 296 (N.J. Super. Ct. App. Div. 2000)).  According to Plaintiffs' expert, if the switch was turned on, the elevator doors would not have closed on Plaintiff's hand.  "Thus, taking the facts in the light most favorable to Plaintiff, the only possible reason for the doors to close on Plaintiff's hand is that Defendant failed to maintain the 3D device in the 'on' position as Plaintiff's expert discovered upon his inspection."  Pl. Br. In Opp'n to Bally's Mot. In Limine, p. 5.  Plaintiff's argument is as follows.

> Here, Plaintiff's expert inspected and tested the subject elevator and found the 3D function to be disabled. *When he tested the doors, the doors closed, which means that the 3D device was functional, just not turned 'on,' because as Defendant's elevator technician confirmed, if the device is broken, the doors will not close at all.* Plaintiff's expert applied the information contained in the Lambda Technical sheet with Plaintiff's uncontroverted testimony and his inspection in order to form his opinion. Thus, Plaintiff's expert's opinion meets the reliable standard set forth in Daubert. As the Johnson Court reminds us, the standard for determining reliability is not that high.

Id. at p. 6 (citing Johnson v. SJP Mgmt., LLC, Civ. No. 07-5545, 2009 WL 367539 (E.D. Pa. Feb. 12, 2009) (emphasis added)).

---

circumstances, particularly where the depositions, affidavits, or briefing before the court are sufficient to perform a proper analysis.  See Oddi v. Ford Motor Co., 234 F.3d 136, 151–54 (3d Cir. 2000).

The guiding principles that inform the Court's judgment are found in Federal Rule of Evidence 702 and <u>Daubert</u>, 509 U.S. 579. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Consistent with that Rule, <u>Daubert</u> established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. See <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003). <u>Daubert</u> also applies to expert testimony relating to "technical or other specialized knowledge." See <u>Oddi v. Ford Motor Corp.</u>, 234 F.3d 136, 146 (3d Cir. 2000) (quoting <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999)). This "trilogy" consists of "qualification, reliability and fit." <u>Id.</u> The Third Circuit liberally construes the qualifications of an expert, noting that "a broad range of knowledge, skills, and training will qualify a witness as an expert . . . ." See <u>Yarchak v. Trek Bicycle Corp.</u>, 208 F. Supp. 2d 470, 495 (D.N.J. 2002) (quoting <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994) ("<u>Paoli II</u>")) (internal quotations omitted). As such, exclusion of an expert witness is "improper simply because an expert does not have the most appropriate degree of training." <u>Yarchak</u>, 208 F. Supp. 2d at 495 (quoting <u>Diaz v. Johnson Matthey, Inc.</u>, 893 F. Supp. 358, 372 (D.N.J. 1995)). Qualification is not at issue in this case.

With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595. Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such

that it will assist the trier of fact.  See Daubert, 509 U.S. at 593.  The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community.  Id. at 593-94.  The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  Paoli II, 35 F.3d at 742 n.8.  When considering these factors, the Court's inquiry must be a "flexible one."  Id.

As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case."  Yarchak, 208 F. Supp. 2d at 496.  The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case."  Id. (citing Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 595 (D.N.J. 2002)).  Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand."  See Calhoun, 350 F.3d at 324.

These factors are not exclusive.  They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.'"  Yarchak, 208 F. Supp. 2d at 495 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)).

In rendering his opinions in this matter, Filippone reviewed and relied upon the Lambda 3D Technical Information Publication.  He also reviewed Schindler's maintenance and repair records and the Inspection Reports from Atlantic City.  (July 29

11

Filippone Report, p. 6, nos. 7, 14, 17; Filippone Dep., 13:15-14:20.)  Filippone testified that the Atlantic City Inspection Reports indicate that the car reopening devices functioned satisfactorily both before and after the subject incident.  (Filippone Dep., 45:14 46:25.)  Filippone testified there is no evidence upon which he relied to indicate that the 3D system was not functioning when the elevator was inspected in 2010, the year of the subject incident.  (Filippone Dep., 46:20-47:10.)  He testified that he did not inspect the controller for the 3D system on the subject elevator to determine if the switches for the 3D system were on or off.  (Filippone Dep., 33:7-12.)  Filippone also testified that he did not know whether either one of two dip switches which control the 3D system - DIP switches 6 and 7 - was on or off.  (Filippone Dep., 39:4-40:17.)  When questioned why he did not examine and document the controller for the 3D system to determine its settings, Filippone testified that "[t]here's no reason to."  (Filippone Dep., 33:16-19.)

      Nonetheless, Filippone opined: "[w]hen [Schindler expert Jon Halpern] and I examined the elevator and the operation of the LAMBDA 3D device on February 16, 2013, the 3D function was not operational."  (Sept. 20 Filippone Report, p. 3; Filippone Dep., 34:13-18, 38:14-18.)  In his deposition, Filippone testified that he determined that the 3D system was off by "standing in front of the doors and [seeing that] the doors would continue to close," then taking a step closer to see if the doors would close again.  (Filippone Dep., 34:19-23, 35:22-25.)  Filippone testified that, with regard to his above-referenced observation of seeing the subject elevator doors close while standing in front of the doors and stepping closer to them, he could not recall the distance of his step forward and that he does not have a standard protocol "as to how many inches out from the elevator" he would have stepped forward.  (Filippone Dep., 36:1-9.)  Filippone also

could not recall whether he took another step closer to the elevator or walked right up to the elevator doors. (Filippone Dep., 36:21 - 37:1.) Filippone testified that that he eventually stood right at the elevator doors and saw them close, and that he did not document the specific distances at which he stood from the elevator doors; his only notes regarding his "test" of the 3D system were "[p]robably just that it wasn't working" and any notes would be in his expert reports. (Filippone Dep., 37:2 - 38:1.) Filippone testified he did not use a ruler or any other device to measure his distance from the elevator doors. (Filippone Dep., 38:2-6.) He also testified that he took no photographs or video recordings of his standing in front of the elevator doors and stepping closer to them. (Filippone Dep., 38:7-9, 38:19-21.)

Filippone testified that he had all of the information needed to calculate the size of the detection zone when the 3D system was active, describing how he would perform such a calculation. (Filippone Dep., 67:8-68:9, 68:16-19.) Filippone testified that, in this case, he did not make any calculation of the size of the detection zone:

> A. It's just like I said. You have a triangle. You have a base, you have a distance that the doors are apart. The altitude is six inches, and then if you want to know any point along the way you can just measure it.
>
> Q. Did you do that in this case?
>
> A. No.
>
> Q. Why not?
>
> A. I didn't think it was necessary.

(Filippone Dep., 68:25 - 69:8.) Filippone testified that he could calculate the circumstances in which a person's hand could be caught in between the closing hoistway

13

doors while the 3D system was active, but he did not make any such calculation. (Filippone Dep., 69:12-20, 70:9-71:12.)

Filippone testified that the 3D system should have detected Ms. Havlik's hand, regardless of how close it was to the edge of the hoistway doors, if it was extended to the point that her wrist would be in between the hoistway doors. (Filippone Dep., 71:21 - 72:4, 72:16.) Filippone testified that he did not know the dimensions of Ms. Havlik's hand. (Filippone Dep., 72:16.) Filippone testified that he could not rule out the possibility that a person's hand could be stuck in between elevator doors with the 3D system active if the hoistway doors contacted the middle of the hand. (Filippone Dep., 72:5-9, 72:15-18, 72:25 - 73:3.) In his expert reports or his testimony, Filippone does not cite any measurements or range of dimensions for the size of Ms. Havlik's hand.

There is no record evidence to suggest that the elevator was negligently maintained or that there was anything wrong with the elevator or the 3D sensor during the year of the Plaintiff's accident, and no evidence of whether the 3D sensor was on or off at the time of her accident. Further, there were no other incidents involving the doors or 3D sensor on this elevator, no safety violations or citations issued by the Atlantic City inspector, and no maintenance or service records from Schindler evidencing any complaints, problems, repairs, or service for the elevator at issue during the year of the Plaintiff's accident. Indeed, defense expert Jon Halpern opined:

> Schindler Elevator maintained the subject elevator and performed regular and systematic maintenance on the elevator and documented the same. Schindler technicians examined and performed maintenance on the door and door safety devices in June, July, September, and November of 2010 and there is no indication of any problems with the door or the door protection. At the time of the incident there was no call or report to Schindler Elevator with respect to this incident, no repair or adjustment made to the subject elevator and no other complaints relating to any malfunction of the doors or the door protection.

> Machine room placard indicates the subject elevator was inspected on June 14, 2010, 6 months prior to the incident and on February 10, 2011 by city inspector Bud Grant, and the elevator was found to be fully compliant with all standards and codes, including the operation of the door protection.

(Aug. 27, 2013 Halpern Report, p. 2.) Yet Filippone's expert report concludes:

> The cause of the door reopening device not detecting Ms. Havlik's hand/wrist is that the 3D function was not turned on. If this 3D protection had been turned on when Ms. Havlik attempted to enter the incident elevator, the doors would not have closed on her hand/wrist and she would not have suffered any injuries. It is unexplained why the 3D protection was not maintained operational by Schindler or Bally's.

(July 29 Filippone Report, p. 3).

Filippone's expert report also acknowledges, however, regarding the 2D sensors:

> Incidents involving passengers being struck by closing doors while entering an elevator are common. People are aware that the doors close automatically and assume that the doors will stop and reopen as they always have in the past when they extend their hand out. They are unaware that the re-opening device is usually only effective when their hand is in the path of the closing *car* door (which has the re-opening device attached to it), but may not be effective when they are in the path of the closing *landing* door.

(July 29 Filippone Report, p. 3 (emphasis in original)). Halpern's opinion follows:

"Plaintiff testified that the door struck her hand between the wrist and the fingers indicating that the plane of the required car door protection was not obstructed and therefore not activated." (Halpern Report, p. 3.) Halpern also opined:

> The subject elevator had an Otis Lambda 3D protection feature, however such a device based on its design cannot guarantee that a passenger who places one's hand into the plane of a closing hoistway door be detected, as indicated in the theory of operation and can be disabled by design without any warning. The 3D feature has an anti-nuisance feature that can also automatically disable the 3D detection due to external factors such as reflections and ambient light.

15

(Halpern Report, p. 3.)  Halpern added, "[t]here is no indication that the Lambda 3D device failed at any time and the same Lambda 3D door protection device was on the elevator at the site examination performed [on] February 6, 2013."  (Id.)  Filippone rationalizes, however, that "[i]t makes much more sense that the 3D feature was not operational when Ms. Havlik was injured and [Schindler and/or Bally's] simply did not enable it."  (Sept. 20 Filippone Report, at p. 3.)

The Court agrees that the conclusion that the 3D function of the subject elevator was not turned on at the time of Plaintiff's accident is unsupported speculation, and therefore unreliable under Daubert.  "If Daubert and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert."  Furlan v. Schindler Elevator Corp., 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012) (quoting Pappas v. Sony Elecs., Inc., 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000)).

In addition, Plaintiffs have not produced evidence from which a reasonable jury could conclude that Defendants' conduct or omission caused Plaintiffs' injury.  There is no proof in the record of negligent maintenance and none that would tend to indicate that the 3D sensor of the elevator was turned off.  Negligence cannot be presumed, it must be proven.  Long v. Landy, 171 A.2d 1 (N.J. 1961).

Further, the record reflects that "[a]t car door separations of 16 inches or less, the target detection zone is inside typical hoistway doors."  Otis Technical Information Publication, p. 41.  Thus, Ms. Havlik's injury could have occurred due to the hoistway doors closing, whether the Lambda 3D switch was on or off.  The issue here is more of whether there was a design defect than one of negligence by these Defendants.  Notably,

Plaintiffs have not claimed that the elevator doors were defectively designed or defectively manufactured.

Although it was not necessary for Plaintiffs to exclude all other possible causes of the accident, they were required to produce evidence from which a fact-finder might reasonably conclude that Defendants were, more probably than not, negligent; Plaintiffs failed to do so.  Accordingly, the doctrine of *res ipsa loquitor* does not apply here since "other responsible causes, including the conduct of the Plaintiff, have not been "sufficiently eliminated by the evidence." Tait v. Armor Elevator Co., 958 F.2d 563, 572 (3d Cir. 1992)).  See Gore v. Otis Elevator Co., 762 A.2d 292, 295 (N.J. Super Ct. App. Div. 2000) (to apply the *res ipsa loquitor* doctrine, "the evidence must support a reasonable inference that it was the defendant who was at fault"); Pace v. Mainstay Suites Hotel, Civ. No. 06-5166, 2008 WL 4861507 (E.D. Pa. Nov. 7, 2008) (*res ipsa loquitor* did not apply because plaintiff failed to show that elevator door closing on plaintiff's arm ordinarily would not occur in the absence of negligence and that there were no other responsible causes for the accident).

Finally, because the loss of consortium claim is dependent upon the claims of negligence, summary judgment on that claim will be granted for the Defendants.

## Conclusion

For these reasons, as well as those articulated on the record during oral argument, IT IS ORDERED on this 30th day of September, 2014 that motions of the Defendants to preclude the testimony of Plaintiff's expert as speculative and for summary judgment [36, 37, 38] are hereby GRANTED.

                                                  /s/ Joseph H. Rodriguez
                                                 JOSEPH H. RODRIGUEZ
                                                     U.S.D.J.